Filed 6/14/13  In re A.C. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | B243857 (Los Angeles County Super. Ct. No. CK 93135) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Appellant, v. RAUL C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Terry Truong, Juvenile Court Referree.  Affirmed.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Appellant.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

* * * * * *

Raul C. (father) appeals from the court's jurisdictional and dispositional order, contending that substantial evidence did not support the court's exercise of jurisdiction and its refusal to place his son, A.C., with father, who was the nonoffending, noncustodial parent. The Los Angeles County Department of Children and Family Services (DCFS) also appeals, arguing the court erred in dismissing certain allegations against Mariela G. (mother). Mother has not appealed. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and mother never married. Mother has one child, A.C., with father and another child, A.A., with another man. Because father is not the parent of A.A., this appeal relates only to A.C. Maternal grandmother, Agustina A., has cared for A.C. since birth and has helped mother raise him. Mother and her children have always lived with Agustina. A.C. is legally blind. At the time of the present referral, A.C. was 13 years old.

The family has three prior referrals with DCFS. In July 2006, the referral alleged general neglect of A.C. by mother. The investigation was inconclusive. In March 2008, the referral alleged general neglect of A.C. and A.A. by mother. The allegations were substantiated, and DCFS placed the children with Agustina. Mother told DCFS that she had a recent history of using methamphetamine and a criminal history, and she admitted to allowing the children to be around maternal aunt, Marissa G., who had an open DCFS case because of drug and criminal activity. The family received voluntary maintenance and reunification services from April 2008 to January 2011. In September 2009, the third referral alleged A.C. and A.A. were at risk of general neglect by an unknown perpetrator. The caller did not suspect abuse/neglect by Agustina, with whom the children resided, but the caller was concerned that Agustina was overwhelmed because she was caring for A.C., A.A., and three other children. The investigation concluded the allegations were unfounded.

Mother was incarcerated in June 2011 for a drug-related charge and parole violation. When she was incarcerated, mother gave temporary custody of A.C. and A.A. to Agustina. A.C. came to the attention of DCFS most recently on or about March 23,

2012, when police officers stopped maternal uncle, Adam A., while he was driving. The passengers of his car included Marissa, two of Marissa's children, Agustina, A.A., and an adult male. A.C. was at home with other relatives. The officers stopped the vehicle because Adam did not use a turn signal and the officers could see children inside who were not properly restrained. When the officers approached the vehicle, they saw Adam pass a bag containing suspected narcotics to Marissa, who then concealed the bag in her pants below her stomach. The officers smelled a marijuana odor emitting from the vehicle and detained Marissa and Adam to conduct an investigation. The officers found on Marissa one bag of suspected methamphetamine, two bags of suspected cocaine, and one bag of suspected marijuana. They also recovered a burnt marijuana cigarette from the dashboard ashtray. They arrested Marissa and Adam for possession of a controlled substance for sale, transportation of a controlled substance, and child endangerment. After they advised Adam of his *Miranda*[1] rights, Adam told them he was a gang member and went by the moniker "Demon." He said he had been addicted to methamphetamine for more than 10 years and was out on bail for a case involving gun possession and sale of narcotics. He had last used methamphetamine five days prior. After the officers advised Marissa of her *Miranda* rights, she told them the drugs belonged to her for personal use. The officers took Marissa and Adam to the station for booking and released the vehicle and the children to Agustina.

DCFS filed a petition on behalf of A.C. and A.A. on April 20, 2012, making a single allegation under Welfare and Institutions Code section 300, subdivision (b),[2] that the children were at substantial risk of physical harm as a result of mother's failure to adequately supervise or protect them, i.e., leaving them in the care of Marissa and Adam. The juvenile court found a prima facie case for detaining the children. A.C. stated that he

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[2]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

3

did not want to be removed from Agustina's home. The court detained A.C. in shelter care pending the results of a prerelease investigation of Agustina.

DCFS filed an amended petition on May 24, 2012, adding allegations that both mother and father had a history of abusing methamphetamine, placing A.C. at risk of harm, and father also had a history of mental problems, rendering him incapable of providing regular care and supervision.

The adjudication hearing was scheduled for June 5, 2012, and then continued to July 23. At the time of the jurisdiction/disposition report, A.C. had been placed back with Agustina. A.C. reported that mother was incarcerated and he thought she had drugs, but he was not sure. He had not seen anyone use drugs. He was not in the car when the officers pulled over Marissa and Adam. He did not often go out because of his vision problems. A.C. did not recall the last time he had seen father and said father "really hasn't been with [him] much." A.C. wanted to stay with Agustina and continue attending his current school, where he enjoyed his "special classes." A.C. is in special education classes due to his vision impairment and also a speech impairment. Although he did not want to move in with father, he said he felt safe being alone with father. A.C. described father as "pretty nice guy." A.C. was born legally blind; he has partial ability to see close up out of one eye. His vision is blurry and he is hypersensitive to light. He has had several eye surgeries. He had surgery recently to place an internal shunt to relieve eye pressure, mostly in his left eye.

DCFS was unable to interview mother for the report because she was incarcerated in Chowchilla. The social worker attempted to contact mother through her counselor approximately seven times to no avail. Marissa reported mother has been arrested three times, including a parole violation, a drug-related charge, and a robbery charge. Marissa said mother's "drug of choice" was methamphetamine, which she began using as an adult. The report from the Department of Justice based on mother's fingerprint records showed mother had an extensive history of arrests or convictions. In 2005, she was arrested for and convicted of being under the influence of a controlled substance. In 2006, she was arrested for possessing drug paraphernalia. In 2007, she was arrested for

4

possessing a controlled substance. In 2008, she was arrested for and convicted of robbery. In 2009, she was arrested for possessing drug paraphernalia. In 2010, she was arrested for being under the influence of a controlled substance. And in 2011 and 2012, she was arrested for and convicted of possessing narcotics and violating parole.

DCFS interviewed father via telephone. Father said he had been diagnosed with schizophrenia when he was younger, around age 22. He was now 33. He heard voices in the past. He did drugs when he was younger (methamphetamine and marijuana) but had been clean for 12 years. Around 2002, he was hospitalized in a psychiatric ward for three days. He was hospitalized again for three days to receive a psychiatric evaluation sometime between 2002 and 2004. He was hospitalized a third time seven years later. He thinks this occurred in 2010, when he "wasn't having a good day and this time it wasn't because of the voices." His mother was "scared" and thought he "was having a trip," and she called the police on him. Father was not on any medications. He did not have any "problems" with Agustina. He had not had a job for the past two years and began collecting unemployment a year ago. He and mother lived together for approximately one year. They separated because he "was the problem" and "the domestic abuse thing did not fly with her." He was arrested in 1999 or 2000 for hitting mother. She left him after that. Mother found him the prior year on Facebook via his sister. He last saw A.C. approximately two months before the DCFS interview and "a couple of times" at the beginning of 2012. It was father's opinion that the family did not need help with anything from DCFS. He was nevertheless willing to participate in family reunification services and any court ordered programs. He was fine with A.C. staying with Agustina if A.C. was fine with the arrangement. Father had one on-demand drug test scheduled. It was not conducted, however, because father was unable to urinate when he showed up.

Paternal grandmother Evangelina C. reported that father was living with her, was not working, and was looking for a job. She said father used drugs in the past and would hear voices but he was "different" now. She thought he had problems and was hospitalized because he did not see his son, and now that he saw A.C., he was at peace

5

and stable. She told him to see a doctor for an evaluation; father did not want to and said his problems were in the past. She was not sure if father could care for A.C. on his own because he had never done it. She did not know if father had ever hit mother. Marissa reported that father had mental health issues and was possibly bipolar. She said he lived with his parents because he is unable to care for himself, and although he appears normal, he gets "paranoid" and "has gotten worse with time."

Marissa reported that she hid marijuana and methamphetamine on her person when she was arrested with her children and A.A. in the vehicle. She said it was for her and Adam's use, and they would use when they did not have the children for the weekend because the children were, for example, staying with Agustina. At the same time, she acknowledged that she and Adam had used when they were responsible for caring for the children. She was out on bail and had the pending criminal case relating to her recent arrest. She reported that she had been using methamphetamine since she was 18 years old and she used approximately once per month. Adam reported that he had used methamphetamine the week before his arrest and he had used marijuana the morning of his arrest, but not in the vehicle with the children. He was incarcerated and was facing a sentence of 36 years in prison as a result of his charges for drug possession and a prior gun possession charge.

Agustina reported that she had not witnessed and was not aware of either mother's or Marissa's drug use until mother was incarcerated on drug-related charges and Marissa tested positive for the dependency case involving her children. She never witnessed Adam using drugs but smelled marijuana on him before. She did not see either Marissa or Adam using marijuana in the vehicle on the day of their arrest. She wanted A.C. and his sibling A.A. to remain with her because she had always cared for them, including taking them to school and medical appointments. She loved them and felt they loved her in return.

Mother appeared with counsel at the adjudication hearing. At the hearing, "mother admit[ted] that she has a history of substance abuse" and did *not* ask the court to strike the count of the petition relating to her substance abuse. Rather, mother asked only

that the count be conformed to proof insofar as it stated she was incarcerated, and she had since been released from prison. She also requested the court amend the count to state that her substance abuse only "periodically" (as opposed to regularly) rendered her incapable of caring for her children. She argued that the court should strike the count relating to her leaving the children in Marissa's and Adam's care because she actually left them in Agustina's care, which was an appropriate plan.

DCFS recommended A.C. and A.A. remain in Agustina's home. It further recommended father submit to at least some drug testing to confirm that his stated history of drug use was definitely in the past. It also wanted father to submit to a psychiatric evaluation to assess whether father needed to be on psychiatric medication. The court sustained a single count of the amended petition, count b-2, which it amended as follows: "The children, [A.C.] and [A.A.]'s mother Mariela [G.], has an unresolved history of substance abuse which included methamphetamine use which periodically renders the mother incapable of providing regular care of the children. The mother's substance abuse places the children at risk of harm." The court struck all other counts of the amended petition, including the count that mother endangered the children by leaving them in Marissa's and Adam's care, and the counts alleging father's substance abuse and mental problems endangered A.C. and A.A. Regarding the counts against father, the court noted that it was not sustaining those counts because "what [is] missing is the nexus."

The court found by clear and convincing evidence that there was a substantial danger to the children's physical health, safety, protection, or emotional well-being if they were to be returned to their mother's care. The court ordered them removed from mother's custody, the parent with whom they typically resided when DCFS filed the petition. Father requested that A.C. be placed with him. The court denied the request and ordered both children to be placed in DCFS's care for suitable placement, which would continue to be with Agustina. The court also ordered father to perform six random or on-demand drug tests, and stated that if father tested positive or had a missed test without a legitimate excuse, he would have to complete a drug rehabilitation program. The court noted, "Just because I don't have enough evidence to sustain a count against

7

you does not mean that I don't believe you may be using." The court ordered reunification services for both parents.

The court scheduled the next hearing and said, "I would like to know how the parents are doing. At that point, I will consider placement of the children with the parents, but for right now, there's just too many red flags in this case for me to warrant having any of the children placed with any of the parents." Both father and DCFS filed timely notices of appeal.

## STANDARD OF REVIEW

In reviewing the jurisdictional findings of the juvenile court, "we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) If supported by substantial evidence, we must uphold the judgment or findings, even though substantial evidence to the contrary may also exist, and the juvenile court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113.)

Likewise, we review the court's dispositional order denying placement with father under the substantial evidence standard. (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569.)

8

## DISCUSSION

### 1. *Substantial Evidence Supported the Court's Jurisdictional Finding Based on Mother's Substance Abuse*

As an initial matter, DCFS contends that father has no standing to challenge the jurisdictional finding based on mother's conduct because mother conceded jurisdiction below and has not challenged it on appeal. But the jurisdictional order served as the basis for the court's dispositional orders, including the orders denying placement with father and for father's drug testing. Without jurisdiction, the court could not have made these orders. It is not accurate to say father is not an aggrieved or affected party. (*In re D.S.* (2007) 156 Cal.App.4th 671, 674.) Father has standing.

Moving to the merits of father's argument, he contends there was no evidence A.C. was at substantial risk of serious harm due to mother's methamphetamine use. We disagree. Under section 300, subdivision (b), the juvenile court may assert jurisdiction over a child when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or *substance abuse*." (Italics added.) When a court makes a finding of substance abuse under section 300, subdivision (b), it does not necessarily "follow that such a finding means that the parent or guardian at issue is unable to provide regular care resulting in a substantial risk of physical harm to the child." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766.) But "[t]he trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*Ibid.*) Cases finding a substantial risk of physical harm under section 300, subdivision (b) "'tend to fall into two factual patterns. One group involves an *identified, specific hazard* in the child's environment -- typically an adult with a proven record of abusiveness. [Citations.] The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety. [Citations.]' [Citation.] And we also

9

hold that, in cases involving the second group, the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M.*, at pp. 766-767.)

There is no real question here that mother is a substance abuser. She acknowledged having a history of substance abuse at the adjudication hearing and did not challenge jurisdiction on the basis that her substance abuse periodically renders her incapable of providing regular care for A.C. She also had a previous case with DCFS in 2008 when she received voluntary services after acknowledging a recent history of using methamphetamine and a criminal history. Even had she not admitted to a substance abuse problem, there was substantial evidence to support the conclusion that she had such a problem. The court may base a finding of substance abuse on evidence showing that the parent at issue has a current substance abuse problem as defined in the DSM-IV-TR.[3] (*In re Drake M., supra*, 211 Cal.App.4th at p. 766.) The DSM-IV-TR defines the condition as "'[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by'" a number of possible things, including "recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)" within a 12-month period. (*Ibid.*) Here, mother experienced at least one drug-related arrest or conviction every year since 2005, except in 2008, when she was convicted of robbery. Mother's drug-related legal problems would qualify her as a substance abuser under the DSM-IV-TR. In not challenging jurisdiction, mother all but admitted A.C. was at substantial risk of harm because of her substance abuse. Although A.C. is no longer a very young child at 13, he has a physical disability in that he is legally blind and can see only partially out of one eye. He has had several eye surgeries in his life and had one around the time of this latest referral to DCFS to place an internal shunt. It is reasonable to infer that A.C. requires more care and supervision than the typical 13

---

[3]    The "DSM-IV-TR" refers to the "American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders." (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 765.)

10

year old, such that mother's substance abuse, which she admits periodically rendered her incapable of caring for him, poses an inherent risk to his physical health and safety.

Father argues this case is like *In re Destiny S.* (2012) 210 Cal.App.4th 999 and *In re David M.* (2005) 134 Cal.App.4th 822, in which the courts held there was no jurisdiction, but those cases are distinguishable. The mother in *Destiny S.* tested positive for methamphetamine and admitted to using marijuana during the initial DCFS investigation, but she tested negative for both for three months leading up to the adjudication hearing. (*Destiny S.*, at pp. 1002, 1004.) The mother challenged jurisdiction, which was based on her alleged substance abuse. (*Id.* at pp. 1001-1002.) Similarly, in *David M.*, although the petition alleged mother had a substance abuse problem, mother tested negative for drugs approximately 18 times between the detention hearing and jurisdiction hearing, and mother also challenged jurisdiction. (*David M.*, at pp. 825, 831.) In neither case did the offending parent admit to a substance abuse problem and concede jurisdiction based on her condition posing a substantial risk of harm, as was the case here. The court did not err in exercising jurisdiction based on mother's admitted substance abuse problem.

## 2. *Substantial Evidence Supported the Court's Order Denying Placement of A.C. with Father*

Father next contends there was no substantial evidence that A.C.'s placement with father would be detrimental to A.C. Father argues that the court's dismissal of the counts against him is conclusive evidence there would be no detriment to placing A.C. with him. Additionally, father says, he is a sober, stable individual fully capable of raising his son. We hold there was substantial evidence supporting the court's decision.

When a nonoffending, noncustodial parent requests custody of a child who has been removed from the child's home, "the court shall place the child with the [noncustodial] parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) "A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th

11

1412, 1425.) "[S]ection 361.2, which governs *placement* after the child has been made a dependent of the court and removal from the custodial parent has already occurred, conspicuously does *not* require that the court find the noncustodial parent might fail to protect the child or that there are no reasonable means to protect the child in the noncustodial parent's home in order to deny the noncustodial parent's request for placement." (*Ibid*.) The detriment need not be related to the noncustodial parent's conduct. (*Ibid.*)

Here, father's argument about the court's dismissal of the counts against him is unpersuasive. The court indicated that it was not sustaining those counts because it did not find evidence of a *nexus* between father's alleged conduct and harm to A.C. This is perhaps unsurprising, given the minimal contact father has had with A.C. and the fact that father has had essentially no responsibility for A.C.'s care and upbringing. Father had been absent from A.C.'s life until the year prior to this referral, when mother located him online through Facebook. Since then, father has visited A.C. only a few times, around three. The court noted its ruling based on lack of nexus did *not* mean it believed father was clean. Father admitted to having used methamphetamine and marijuana in the past. He was unable to complete the only scheduled drug test prior to the adjudication hearing to confirm his statement that he was clean. Additionally, he was diagnosed with schizophrenia approximately 11 years ago and had been hospitalized three times, but he was not on any medications for it. Marissa described him as unable to care for himself. His mother, Evangelina, wanted him to seek current treatment for his mental health; father denied that he needed any. Evangelina was not sure if father could care for A.C. on his own. Contrary to father's assertion, there was evidence that he was not a stable individual. Additionally, A.C. has special needs and wanted to remain with Agustina, who has cared for and lived with A.C. since birth. While A.C. thought father was a "nice guy," he did not want to live with him and wanted to stay at his school where he enjoyed his special education classes. Although the court could not have based its detriment determination on A.C.'s wishes alone, it was entitled to consider A.C.'s wishes. (*In re Luke M.*, *supra*, 107 Cal.App.4th at p. 1426.) In light of the evidence regarding father's

mental health, the question about his ability to care for A.C., his limited role thus far in A.C.'s life, A.C.'s special needs, A.C.'s desire to remain with Agustina, and Agustina's role as A.C.'s lifelong caretaker, there was substantial evidence supporting a finding of detriment in placing A.C. with father.

### 3. *DCFS's Appeal Is Nonjusticiable*

DCFS has cross-appealed, arguing that the court erred when it dismissed the allegations that mother endangered A.C. by leaving him under the care of Marissa and Adam (the (b)(1) allegations). DCFS's appeal does not present a justiciable issue, and we therefore decline to address the merits of its contention.

"'"[As] a general rule it is not within the function of the court to act upon or decide a moot question or speculative, theoretical or abstract question or proposition, or a purely academic question, or to give an advisory opinion on such a question or proposition. . . ."'" [Citation.] An important requirement for justiciability is the availability of 'effective' relief -- that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.)

"Once [a] child is found to be endangered in the manner described by one of the subdivisions of section 300 . . . the child comes within the court's jurisdiction . . . ." (*In re I.A., supra*, 201 Cal.App.4th at p. 1491.) "[A]n appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*Id.* at p. 1492.)

We have already determined that substantial evidence supported the court's exercise of jurisdiction apart from the (b)(1) allegations. DCFS asserts we should nevertheless exercise our discretion to address its appeal because there would be practical consequences to reversing the court's dismissal -- namely, the sustained (b)(1) allegations "would inform mother's treatment provider regarding the detrimental home environment she established for her children," and mother would be "made to address her negligent attitude in regard to drugs and their impact on her children's safety." But the sustained allegations that mother's substance abuse endangered A.C. adequately inform her

13

treatment provider in this respect. We fail to see how the (b)(1) allegations would significantly change mother's treatment plan, and DCFS does not attempt to explain this. Because any order we enter will have no practical effect on the dependency proceeding, thereby precluding a grant of effective relief, we find DCFS's appeal to be nonjusticiable. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1491.)

Even were we to consider the merits of DCFS's appeal, we would find substantial evidence supported the court's dismissal of the (b)(1) allegations. Those allegations stated that mother "left the children in the care of the children's maternal aunt" Marissa and "maternal aunt's male companion Adam" when mother was incarcerated. But it was undisputed that mother left A.C. and his brother in Agustina's care. DCFS did not appear to believe they were at risk in Agustina's care, insofar as it recommended to the court that they remain with her.

## DISPOSITION

DCFS's appeal is dismissed. The judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.

14